DAN P. CHOISSER

*v.*

LEWIS E. YORK.

*Opinion filed April 20, 1904—Rehearing denied October 13, 1904.*

1. ELECTIONS—*when ballots should not overcome returns.* Ballots which have not been properly preserved, and which have been tampered with or exposed to the interference of unauthorized persons, should not prevail over the returns.

2. SAME—*when the ballots are properly rejected for containing colored papers.* Ballots having pieces of colored paper folded up with them are properly rejected on re-count, where there is no explanation of the presence of the papers and there is evidence that a person working for one of the tickets exhibited pieces of paper of same color and stated that persons voting that ticket with such pieces folded in the ballot would receive money.

3. SAME—*failure of judges to sign or certify returns is not an objection on contest.*  Failure of the judges of election to sign or certify the returns or fill out the proper blanks, although ground for the re-fusal of the canvassing board to canvass the returns until such irregularity is corrected, is not ground for objection on contest.

4. SAME—*failure to make proclamation does not vitiate election.*  Failure of the judges in an election precinct to make proclamation announcing the result of the election does not vitiate the election in the precinct, since the statutory provision for such proclamation is merely directory.

5. SAME—*what does not vitiate election.*  That persons not properly selected acted as election judges in the places of those regularly appointed, who failed to appear, and that no register of voters was used, does not vitiate the election, where the persons acting as judges took the oath of office and it is not shown that any illegal votes were cast in consequence of the failure to use the register. (SCOTT and BOGGS, JJ., dissenting.)

6. SAME—*the use of adjoining room for additional booth is unlawful.*  The use of a small room adjoining the one in which the election was held, for an extra booth, is unlawful, and the ballots marked therein cannot be counted.

7. SAME—*unlawful votes should be apportioned where evidence does not show for whom they were cast.*  Where the evidence fails to show for whom ballots marked in a room adjoining the election room were cast, the number of such illegal votes should be apportioned between the candidates in the proportion that the vote cast for each bears to the whole vote cast in the precinct.

8. SAME—*use of rubber stamp for initials of judge is unlawful.*  The use of a rubber stamp for endorsing the initials of an election judge upon the ballots is unlawful and all ballots so stamped must be rejected.  (SCOTT and BOGGS, JJ., dissenting.)

9. SAME—*when vote is illegal.*  The vote of one of the judges of election who openly and publicly prepared his ballot in defiance of law is illegal.

RICKS, J., dissenting generally.

APPEAL from the Circuit Court of Saline county; the Hon. A. K. VICKERS, Judge, presiding.

C. S. CONGER, L. O. WHITNEL, ABNEY & BURNETT, and CHOISSER, CHOISSER & KANE, for appellant.

A. W. LEWIS, R. S. MARSH, W. F. SCOTT, and M. S. WHITLEY, for appellee.

Mr. CHIEF JUSTICE HAND delivered the opinion of the court:

This is an appeal from an order of the circuit court of Saline county dismissing the petition in a proceeding commenced by the appellant, against the appellee, in that court, to contest the election of the appellee to the office of county superintendent of schools of Saline county.

The appellant and appellee, at the general election held in Saline county on the fourth day of November, 1902, were candidates, respectively, of the democratic and republican parties for the office of county superintendent of schools. The votes cast at the election were duly canvassed by the canvassing board of said county, and it was determined that the appellee had received 2086 and the appellant 2083 votes for said office, and the appellee was declared duly elected, received a certificate of election and entered upon the duties of the office. A contest was subsequently commenced by the appellant, and upon a trial the court found the appellee had received 2080 votes and the appellant 2073 votes for said office, and that the appellee was duly elected, and dismissed the proceedings at appellant's costs.

There are located in Saline county fifteen voting precincts, namely, Tate, Galatia, Carrier Mills, Stone Fort, Brushy, Long Branch, Raleigh, Harrisburg No. 1, Harrisburg No. 2, Independence, Rector, East Eldorado No. 1, East Eldorado No. 2, Cottage and Mountain.

The record is voluminous, and the appellant has assigned errors and the appellee cross-errors thereon, and the questions discussed in the briefs will be considered in their logical order, so far as is practicable, regardless of by whom they are raised.

*First*—It is said the court erred in holding that the returns of the judges of the election should prevail over the ballots in determining the result of the election. The

returns, as well as the ballots, in all of the precincts in which the correctness of the vote was challenged by either party were admitted in evidence, subject to objection. It appeared, however, when the evidence was all in, that the ballots had not been properly kept; that they had been tampered with and in many instances changed, and the court, while there is no specific ruling to that effect, seems to have given the ballots but little weight, and to have based its decision mainly upon the returns. In *Perkins* v. *Bertrand*, 192 Ill. 58, it was held that the ballots are the best evidence of the result of an election if they have been properly preserved and have not been exposed to the reach of unauthorized persons, and that whether ballots have been properly preserved is a question of fact, to be determined from all the circumstances in proof. The evidence found in this record shows that the ballots cast at said election were placed in the county clerk's office in a vault where they were accessible to unauthorized persons; that in some instances the seals upon the packages containing the ballots had been broken; that the ballots had been removed from the wires upon which they were strung, and that many of the ballots had been changed or disfigured, and in view of these facts we think the trial court was justified in holding that the ballots failed to overcome the returns, and properly grounded its decision upon the returns.

*Second*—It is said that the court erred in refusing to eliminate from the re-count a large number of ballots on the ground that they bore distinguishing marks. From the manner in which the ballots had been kept it was impossible to determine whether what are designated as distinguishing marks were upon the ballots when cast, or whether such marks had been placed upon the ballots since that time. The condition of these ballots, disfigured as they are in many instances, emphasizes the wisdom of preserving the ballots in the manner and by the officers designated in the statute, otherwise their value

as evidence on a contest is utterly destroyed. The court did not err in declining to eliminate from the re-count the ballots alleged to bear distinguishing marks.

*Third*—The trial court found that fifteen illegal votes were cast at said election, five of which were cast for appellant and four for appellee, and that it was unable to determine, from the evidence, for which candidate six of the said votes were cast, and apportioned the six votes between the parties in the proportion the vote of each bore to the whole number of votes cast; that is, the court deducted eight of the votes held to be illegal from the vote of the appellant and seven from the vote of the appellee. The illegality of said fifteen votes was predicated upon the fact that the persons by whom they were cast were not residents of and entitled to vote at the several precincts where they deposited their ballots. The testimony as to whether said persons whose votes were rejected were residents of the several precincts in which they cast their votes was conflicting, and the testimony upon which the court determined for whom nine of said illegal votes were cast was based entirely upon proof tending to show to which of the political parties,— that is, democratic or republican,—the persons casting illegal votes belonged, and the presumption that members of a political party usually vote their party ticket. (*Sorenson* v. *Sorenson*, 189 Ill. 179; *Rexroth* v. *Schein*, 206 id. 80.) From an examination of the testimony in this record we think the court was justified in its conclusion as to the number of illegal votes cast at the election, that five thereof were cast for the appellant and four for the appellee, and that as to six it could not be reasonably ascertained for whom they were cast, and that they were properly apportioned between the candidates. (*People* v. *Cicott*, 16 Mich. 282.) These questions were determined upon conflicting evidence heard in open court, and the court having seen and heard the witnesses, this court will not disturb the finding of the trial court unless its

finding is manifestly wrong, which we are unable to demonstrate, from the evidence, to be true in the case at bar.

*Fourth*—In Independence precinct the canvassing board gave appellee 205 votes and appellant 101 votes. The evidence clearly shows that in that precinct only 201 votes were cast for appellee and that 104 were cast for appellant, and that the returns from that precinct were changed after they were made by the judges and clerks of election and before they were delivered to the canvassing board. The judge to whom the returns were intrusted to be delivered to the county clerk was guilty of gross carelessness. Instead of retaining possession of the ballots and returns until he could deliver them to the county clerk, he took them, the evening of the election, to the house of a neighbor, where they remained in unauthorized hands until the next day, when he returned and again took possession of them and delivered them to the clerk. The evidence also shows, without contradiction, that when the votes of Independence precinct were being counted, three of the democratic ballots had folded in them pieces of colored paper,—two blue and one yellow. It also shows that on the day of the election one of the members of the democratic party working for that ticket exhibited pieces of paper of that color, and stated that those who would vote the straight democratic ticket with such colored pieces of paper folded in them would receive "at Jim Mitchell's store, the next day," two dollars. Mitchell was a merchant in Independence and also belonged to the democratic party. No explanation is found in the record of how these pieces of paper became folded in the ballots. The slips were doubtless inserted within the ballots for the purpose of designating for whom the voters whose ballots contained them had cast their votes, and the court properly rejected the ballots which contained said slips from the count. The court also found that William Mealer, who voted in Independence precinct, cast an illegal vote for

appellee. The trial judge counted 200 votes for the appellee and 101 votes for the appellant in Independence precinct. We find no reason in the record for disturbing the re-count in that precinct.

*Fifth*—In Rector precinct the returns were not signed or certified by the judges and clerks, as required by the statute. Section 61 of chapter 46, (2 Starr & Cur. Stat.—2d ed.—par. 62, p. 1651,) expressly provides that "when the votes shall have been examined and counted, the clerks shall set down in their poll-books the name of every person voted for, written at full length, the office for which such person received such votes, and the number he did receive, the number being expressed in words at full length; such entry to be made, as nearly as circumstances will admit, in the following form:" (Then follows the form to be signed by the judges.) The next section provides: "Before said returns are sealed up, as aforesaid, the judges shall compare said tally papers, footings and certificates, and see that they are correct and duplicates of each other, and certify to the correctness of the same." In this voting precinct the judges and clerks did not comply with either one of the foregoing sections, or even attempt to do so. None of the required blanks were filled out; neither were the certificates signed by either judges or clerks, or the vote of any candidate certified. It is claimed that on account of this omission of duty the vote of that precinct should not have been counted by the canvassing board.

In *People* v. *Nordheim*, 99 Ill. 553, it was held that without the certificate required by the statute the returns of the precinct should not be received by the canvassing board and counted, and the rule announced in that case was re-affirmed in the case of *County of Lawrence* v. *Schmaulhausen*, 123 Ill. 321. In the latter case, however, it was held that the irregularity could not be availed of in a proceeding to contest an election under the provisions of sections 113 to 123 of chapter 46 of the Revised

Statutes. And in *Schuler* v. *Hogan*, 168 Ill. 369, it was said (p. 375): "The present petition is filed under section 113 of chapter 46 of the Revised Statutes in regard to elections. Proceedings under this section and the sections following it, for the contesting of an election, are prescribed 'for the purpose of finding out how many votes were cast for or against a candidate, or for or against a measure, and thereby ascertaining the will of the people.' (*Allerton* v. *Hopkins*, 160 Ill. 448; *County of Lawrence* v. *Schmaulhausen*, 123 id. 321.) 'It has always been held in this State, that, if the intention of the voter can be fairly ascertained from his ballot though not in strict conformity with the law, effect will be given to that intention; in other words, that the voter should not be disfranchised or deprived of his right to vote through mere inadvertence, mistake or ignorance, if an honest intention can be ascertained from his ballot.' (*Parker* v. *Orr*, 158 Ill. 609.) Inasmuch as the purpose of the contest is the sustaining of the will of the voters and to give effect to the intention of such voters, provisions of the statute which are merely directory in their character will not be so construed as to defeat the result of an election, which is based upon the majority of the votes cast at the election and which has been ascertained by a fair count of the ballots." The proper practice by the board of canvassers would doubtless have been to have refused to canvass the vote from Rector precinct until the election officers had complied with the statutory requirements to certify the same, but under the foregoing authorities the irregularity complained of cannot be urged in this proceeding.

*Sixth*—It is also alleged that no proclamation was made by the judges of election in any of the voting precincts of the county, except in Galatia and Stone Fort. Section 27 of chapter 46 (2 Starr & Cur. Stat.—2d ed.— par. 191, p. 1690,) prescribes the duty of the judges of election in that regard in the following language: "When the canvass of the ballots shall have been completed,

as now provided by law, the clerk shall announce to the judges the total number of votes received by each candidate; each judge of election in turn shall then proclaim in a loud voice the total number of votes received by each of the persons voted for and the office for which he is designated, and the number of votes for and the number of votes against any proposition which shall have been submitted to a vote of the people; such proposition [proclamation] shall be *prima facie* evidence of the result of such canvass of the ballots." It is the rule very generally recognized, that the misconduct of election officers, and irregularities on their part in conducting an election, will not vitiate the election unless it appears the result was affected thereby, and that the votes of innocent electors ought not to be invalidated by irregularities on the part of public officials when such irregularities have not prevented a free and fair expression of the electors, unless the legislature has expressly so declared. We are of the opinion that the statute requiring the judges to make proclamation, like that requiring them to string the ballots, is merely directory, (*Murphy* v. *Battle*, 155 Ill. 182,) and that under the rule announced in *County of Lawrence* v. *Schmaulhausen, supra*, and *Schuler* v. *Hogan, supra*, the failure to make such proclamation did not vitiate the election in those precincts in which no proclamations were made.

*Seventh*—It is insisted that the returns from Harrisburg precinct No. 2 should have been excluded by the board of canvassers, and by the trial court on the hearing, because of irregularities in the manner of conducting the election in that precinct. The testimony shows that on the morning of the election none of the judges regularly appointed appeared, and other persons took their places without having been properly selected; that the polling place was established in a room in the court house not opening upon a public thoroughfare; that no register of voters was used, and that some thirty or

thirty-five persons prepared ballots outside of the booths, which were counted by the judges. It appears that the voting place was the one established by the proper authorities, and had been the authorized and usual voting place in that precinct since the year 1885; that the persons who held the election took the oath of office as judges; that about 500 votes were cast in the precinct and only three booths had been provided by the authorities, and for that reason some of the ballots were marked outside of the regular booths, in a small room adjoining the room in which the election was held. We are of the opinion that the judges were at least judges *de facto;* that the election was not void by reason of the location and situation of the building in which it was held, (*People* v. *Brown*, 189 Ill. 619,) and that the failure to use the register of voters did not deprive the electors of their right of suffrage, it not being shown that any illegal votes were cast in consequence thereof. *People* v. *Logan County*, 63 Ill. 374; *Hodge* v. *Linn*, 100 id. 397.

Section 21 of the Ballot law (2 Starr & Cur. Stat.— 2d ed.—p. 1687,) provides: "All officers upon whom is imposed by law the duty of designing or providing polling places shall provide in each polling place so designated or provided a sufficient number of booths, which shall be provided with such supplies and conveniences, including shelves, pens, pen-holders, ink, blotters and pencils, as will enable the voter to prepare his ballot for voting, and in which voters may prepare their ballots screened from all observation as to the manner in which they do so; and the guard-rail shall be so constructed and placed that only such persons as are inside said rail can approach within six feet of the ballot-box and of such voting booths. The arrangement shall be such that the voting booths can only be reached by passing within said guard-rail. They shall be within plain view of the election officers, and both they and the ballot-boxes shall be within plain view of those outside of the guard-rail.

211—5

Each of said booths shall have three sides enclosed, one side in front to be closed with a curtain. Each side of each booth shall be six feet four inches and the curtain shall extend within two feet of the floor, which shall be closed while the voter is preparing his ballot. Each booth shall be at least thirty-two inches square and shall contain a shelf at least one foot wide, at a convenient height for writing. No person other than the election officers and challengers allowed by law, and those admitted for the purpose of voting as hereinafter provided, shall be permitted within the guard-rail, except by authority of the election officers to enforce the law. The number of such voting booths shall not be less than one to every seventy-five voters or fraction thereof who voted at the last preceding election in the district."

This provision of the statute is an important one, and should not be disregarded. It has been held that a failure of election officers to erect booths in compliance with the law was an irregularity which would not vitiate the election. (*Moyer* v. *Van de Vanter*, 12 Wash. 377; 50 Am. St. Rep. 900.) We are of the opinion, however, this statute is so far mandatory that it must substantially be complied with. To permit a room adjoining the room in which the election is held to be used as a booth would open wide the door for fraud by permitting unauthorized persons to have access to the voter, and it would substantially destroy the seclusion of the citizen while preparing his ballot,—at least such might be the result. The evidence shows that as many as thirty voters in Harrisburg precinct No. 2 prepared their ballots outside of the booths. Our conclusion is that those ballots should be eliminated from the count, and as there is no evidence in the record from which it can be determined for whom such voters cast their ballots, said votes should be apportioned between the candidates in the proportion that the vote cast for each bears to the whole vote cast in the precinct. In this precinct George Abney, one of the

judges, voted for appellant. He openly and publicly prepared and marked his ballot in defiance of the other judges. His vote was counted both by the canvassing board and the trial court. The vote was cast in defiance of law, was an illegal vote and should have been rejected.

*Eighth*—On the night prior to the election, R. V. Groce, one of the judges of Carrier Mills precinct, had a stamp made with the letters "R. V. G." on it, and on the day of the election, instead of endorsing his initials on the ballots which he delivered to voters, with a pen or pencil, he used this rubber stamp, and while he was absent from the voting place one of the other judges used the same stamp upon ballots handed out by him, so that all the votes cast at that precinct were stamped with that stamp and none of them had endorsed on the back thereof the initials of one of the judges of said election.

Section 22 of chapter 46, (2 Starr & Cur. Stat.—2d ed. —par. 186, p. 1688,) entitled "Elections," provides: "Any person desiring to vote shall give his name and, if required to do so, his residence, to the judges of election, one of whom shall thereupon announce the same in a loud and distinct tone of voice, clear and audible; and if such name is found on the register of voters by the officer having charge thereof, he shall likewise repeat said name and the voter shall be allowed to enter the space enclosed by the guard-rail, as above provided. One of the judges shall give the voter one, and only one, ballot, on the back of which such judge shall endorse his initials in such manner that they may be seen when the ballot is properly folded, and the voter's name shall be immediately checked on the register list." Section 26 of the same chapter provides, among other things: "No ballot without the official endorsement shall be allowed to be deposited in the ballot-box, and none but ballots provided in accordance with the provisions of this act shall be counted." Under these sections we have held that the endorsement, on the back of the ballot, of the initials of

one of the election judges is mandatory, without which the vote should not be counted. (*Kelly* v. *Adams*, 183 Ill. 193.) In *Caldwell* v. *McElvain*, 184 Ill. 552, we again held that ballots not having the initials of the judges of elections endorsed thereon cannot be counted, in the absence of evidence tending to show fraud or mistake upon the part of the judges, the presumption being that the judges of election have discharged their duty. And again, in *Perkins* v. *Bertrand, supra*, we held that the endorsement as provided by the statute is mandatory, but that a single initial or the whole name of one of the judges was a sufficient compliance with the requirement.

It is perfectly clear that the object of the requirement of the statute as to the endorsement of the initials of one of the judges of elections was intended by the legislature as a safeguard to prevent fraudulent voting, and it is difficult to see how it can be seriously contended that the mere stamping of the initial letters of one of the judges upon the ballot would serve that purpose. In the present case it does not even appear that the letters on the stamp were *fac similes* of the initials of R. V. Groce. Neither had he placed the stamp on all the ballots, but left it in the possession and control of another, who used it. The statute is, not only that the initials of one of the judges shall be placed upon the ballot, but that the particular judge who hands the ballot to the voter shall endorse his initials thereon. Every man's handwriting possesses certain peculiarities which tend to distinguish it from every other handwriting. By writing his initials upon ballots the judge doing so should be able to distinguish those which are genuine, and could generally do so. Any person can procure a stamp. We think the statute contemplates that the endorsement shall be in the handwriting of one of the judges of the election, and that an endorsement with a stamp in lieu of such endorsement is unwarranted. If such practice were approved it would tend to render nugatory one of

the efficient means adopted by the legislature for the detection of fraud, and we are of the opinion that the canvassing board and the trial court should have eliminated the entire vote of Carrier Mills precinct from the count.

We have examined this record with care, and are satisfied with the conclusions reached by the circuit court except as to the precincts of Harrisburg No. 2 and Carrier Mills. As to the precinct of Carrier Mills the entire vote will be excluded from the count, and as to the precinct of Harrisburg No. 2 thirty votes will be eliminated from the count, ten of which votes will be deducted from the vote of appellant and twenty from the vote of appellee. The vote of George Abney, cast in Harrisburg No. 2, will also be eliminated from the vote of appellant, the result of which is, that the appellant is found to have received 1849 votes and the appellee 1895 votes at said election for the office of county superintendent of schools for said county of Saline.

The appellee having received a majority of all the votes cast, the order of the circuit court dismissing the proceedings at appellant's costs will be affirmed.

*Order affirmed.*

Mr. JUSTICE MAGRUDER: I concur in the conclusion reached by the foregoing opinion and in the general line of reasoning adopted therein, but not in all that is said in the opinion.

BOGGS and SCOTT, JJ., dissenting:

We have been unable to concur in the opinion prepared by Mr. Chief Justice HAND.

In Independence precinct the vote as counted and certified by the election judges gave York 201 votes and Choisser 104 votes. After the return from this precinct had been properly made and sealed up, one of the judges, W. T. Glass, took possession of the returns that were to go to the county clerk and Secretary of State, carried them to the house of a man by the name of Jenkins, put

them on a bed and left them there until eight or nine o'clock the next morning, and finally on that day delivered one set of the returns to the county clerk about two o'clock P. M. In the meantime someone in York's interest, without the consent of the election judges, fraudulently altered the returns so that they showed that York's vote was 205 and Choisser's 101 in this precinct. The canvassing board gave to each the number of votes shown by the mutilated returns, and reached the conclusion that York had received 2086 votes and Choisser 2083 votes in the county, and thereupon declared the former elected. Had the returns of Independence precinct been canvassed as made by the election judges, the result of the canvass would have shown that York received 2082 votes and Choisser 2086 votes in the county. It appears that the unlawful alteration of the returns from this precinct deprived Choisser of the certificate of election and resulted in the same issuing to York.

In the trial of this contest below the following result was declared by the court in the various precincts of the county:

|  | For Choisser. | For York. |
|---|---|---|
| Tate precinct ...........................118 | | 62 |
| Galatia precinct ........................108 | | 155 |
| Brushy precinct ........................162 | | 91 |
| Carrier Mills precinct...................213 | | 165 |
| Stone Fort precinct...................... 60 | | 109 |
| Long Branch precinct................... 94 | | 70 |
| Raleigh precinct.........................238 | | 115 |
| Harrisburg No. 1 district.............. ...110 | | 304 |
| Harrisburg No. 2 district................167 | | 341 |
| Independence precinct..................101 | | 200 |
| Rector precinct.........................105 | | 49 |
| East Eldorado No. 1 district.............186 | | 144 |
| East Eldorado No. 2 district.............172 | | 101 |
| Cottage precinct........................119 | | 73 |
| Mountain precinct......................120 | | 101 |
| Total...............................2073 | | 2080 |

From the vote of Choisser the majority opinion in this court properly deducts the vote of George Abney and 10 other votes in Harrisburg district No. 2, which would

leave his vote at 2062, and properly deducts from the vote of York 20 votes in the same district, which would leave his vote at 2060 and give Choisser two majority, but in addition to this the majority opinion, improperly, as we think, rejects the entire vote of Carrier Mills precinct, thereby reducing Choisser's vote to 1849 and York's vote to 1895, resulting in a majority of 46 for the latter, and the conclusion is thereby reached that the appellee, York, was duly elected to the office of county superintendent of schools. This results from the holding that all the votes cast at the precinct of Carrier Mills should be rejected and not counted, for the reason the initials of one of the judges of the election at that poll were, it seems, placed on the ballots with a stamp. This ruling deprives the legal voters of Carrier Mills of the right to have the votes cast by them at that election counted because of the honest mistake of an election officer in believing that he could endorse his initials on the ballots with a stamp. If this holding be correct, the right of legally qualified electors to exercise the elective franchise may be taken away from them without any wrongful act or negligence on their part, by the honest mistake of an election officer as to the true construction of a provision of the statute. It would also follow that the like disfranchisement of voters might be accomplished by the fraud or wrong of such an officer. If the ruling be correct, the right of every legal voter to cast his ballot and have it counted is held in the hands of and is at the mercy of the judges of the election. We cannot assent that an election officer, by intentional fraud or wrong or by innocent misconception of the true meaning of the statute, can deprive legally qualified electors of the right to vote.

The right to vote is created by the constitution of the State. Section 1 of article 7 of the constitution of 1870 reads as follows: "Every person having resided in this State one year, in the county ninety days, and in the

election district thirty days next preceding any election therein, who was an elector in this State on the first day of April, in the year of our Lord 1848, or obtained a certificate of naturalization before any court of record in this State prior to the first day of January, in the year of our Lord 1870, or who shall be a male citizen of the United States, above the age of twenty-one years, shall be entitled to vote at such election." Section 7 of the same article empowers the legislature to exclude from the right of suffrage persons who have been convicted of infamous crimes, and according to the familiar rule of construction, the grant of power to deny the elective franchise to those convicted of infamous crimes implies the denial of power to deprive one who is entitled to vote under the first section of the article, of that right for any other reason than that he has been convicted of an infamous crime. The denial of power to exclude voters for any other cause is declared by a rule of construction that is so fundamental and uniformly established as to make any citation of authorities entirely useless. The right to vote being a constitutional right, it cannot be taken away by legislation, and the right to vote carries with it the right to have the vote counted. (McCrary on Elections, sec. 48; *Moyer* v. *Van de Vanter*, (Wash.) 41 Pac. Rep. 60; *Attorney General* v. *Detroit*, 78 Mich. 545.) The General Assembly, it is freely conceded, may prescribe reasonably proper and necessary regulations controlling the manner and mode of exercising the right, but regulations which destroy or substantially impair the constitutional privileges of the elector by reason of the mistake or fraud of an election officer are beyond the power of the legislature, and cannot be enforced because in contravention of the organic law of the land. (McCrary on Elections, sec. 133; *Moyer* v. *Van de Vanter, supra; Attorney General* v. *Detroit, supra; Monroe* v. *Collins*, 17 Ohio St. 665.) In the latter case it was said, in substance: The legislature have no power, directly or indirectly, to deny or

abridge the constitutional right of citizens to vote or unnecessarily to impede its exercise, and laws passed professedly to regulate its exercise or prevent its abuse must be reasonable, uniform and impartial.

In *Moyer* v. *Van de Vanter*, *supra*, it is said: "Can the legislature enact a law whereby election officers can practically disfranchise all the electors of a precinct, where the electors themselves are not at fault? If so, the constitutional guaranty is of small consequence. * * * The individual voter may well be called upon to see that the requirements of the law applying to himself are complied with before casting his ballot, and if he should willfully or carelessly violate the same there would be no hardship or injustice in depriving him of his vote; but if, on the other hand, he should in good faith comply with the law upon his part, it would be a great hardship were he deprived of his ballot through some fault or mistake of an election officer in failing to comply with a provision of the law over which the voter had no control. It is also a question in which the public has a direct and important interest, for the loss of such votes may have a controlling effect upon a public matter. The constitutional provision aforesaid guarantees the right to vote, and this, of necessity, carries with it the right to have the vote counted. Of course, the manner of voting and canvassing votes must be subject to all reasonable legislative requirements."

In *Attorney General* v. *Detroit*, *supra*, it was said: "The power of the legislature is limited to laws regulating the enjoyment of the right by facilitating its lawful exercise and by preventing its abuse. The right to vote must not be impaired by the regulation," and, as supporting that proposition, the Michigan court cited *Page* v. *Allen*, 58 Pa. St. 338, *Dills* v. *Kennedy*, 49 Wis. 555, *Edmonds* v. *Banbury*, 28 Iowa, 267, *Monroe* v. *Collins*, 17 Ohio St. 665, *Daggett* v. *Hudson*, 43 id. 561, *State* v. *Baker*, 38 Wis. 71, and *State* v. *Butts*, 31 Kan. 554.

Again, McCrary, in his work on Elections, (sec. 240,) says: "The citizens possess the prerogative of voting, and the legislature cannot take that right away by encompassing an election law with unconstitutional provisions."

In recognition of this principle we said in *Caldwell* v. *McElvain,* 184 Ill. 552, "that ballots not having the initials of the judge of election endorsed thereon cannot be counted, in the absence of evidence tending to show fraud or mistake on the part of the judges." In the case at bar the mistake of the judges at Carrier Mills is shown by undisputed evidence, and clearly the ballots cast there ought to be counted.

In *Perkins* v. *Bertrand,* 192 Ill. 58, it was urged that ballots should be rejected for the failure of the judge of the election to endorse his initials on the ballots. The judge had endorsed one letter, only, on the ballot, but that was one of his initials, and we held the voter not deprived of the right to vote by the failure of the judge of the election to comply literally with the provisions of the statute.

If the law be as held in the majority opinion, it is in the power of any election judge to disfranchise a voter known by him to be of the opposite political faith, by failing to endorse his initials on the ballot of that voter, unless, indeed, the voter should observe the omission and be able to induce the officer to correct it. Electors do not so hold their constitutional privileges at the will of election judges. The statute provides for the punishment of an election judge who willfully neglects to perform his duty or who shall willfully perform it in such a way as to "hinder the object" of the election laws. The enforcement of these provisions may be resorted to to secure compliance with official duty, and it seems indefensible to visit the sins or omissions of the officials on the innocent voter, even if no constitutional provision existed for his protection.

In Harrisburg district No. 2, as found by the court below, Choisser received 167 votes and York received 341 votes. The majority opinion reduces Choisser's vote by deducting therefrom George Abney's vote and 10 of the 30 votes which were marked outside the booths, thereby leaving his total in that district stand at 156, and reduces York's vote by deducting therefrom 20 of said 30 votes, leaving his total in that district at 321, thus giving him a majority of 165 at that polling place. In this district the election judges selected by the board of supervisors in the regular manner were Ira Gibbons, F. C. Glasscock and J. E. Jobe. Neither of these men appeared on the morning of the election, and the voters present did not select judges to act in their places, as the statute requires. Instead, C. A. Taylor, M. B. Gaskins and G. W. Abney appeared and announced that they would hold the election. It is not shown how or by what authority these men obtained possession of the official ballots. Taylor testified that he acted as judge at the request of D. D. Lockwood, who was an election judge in Harrisburg district No. 1, as shown by the supervisor's record. Gaskins testified that he acted at the request of Mr. Bauder, supervisor of the township. Neither Bauder nor Lockwood was present at the opening of the polls. How Abney came to act does not appear. These men, in conducting the election, did not use the register made in accordance with the statute, but instead used the poll-list or poll-book of Ed. M. Stricklin, who was the republican challenger at that polling place. They permitted persons to vote to whom objection was made, without requiring any affidavits showing their qualifications and without it being made to appear that they were registered. The room in which the election was held did not open upon the street, as required by the statute. There was a partition extending part way across the room, and the polling place and the booths were on one side of this partition. During the day, voters, at the direction of those acting

as judges, instead of going into the booths went upon the other side of this partition and there prepared their ballots. How many voters prepared their ballots there does not appear with any certainty. One witness roughly estimated thirty or thirty-five voters. In the portion of the room in which they so prepared their ballots there was a window and a door, the latter opening into a hall.

Paragraph 186 of chapter 46, Starr & Curtis' Statutes, provides: "Any person desiring to vote shall give his name and, if required to do so, his residence, to the judges of election, * * * and if such name is found on the register of voters by the officer having charge thereof, he shall likewise repeat said name and the voter shall be allowed to enter the space inclosed by the guard-rail. * * * If the name of any person so desiring to vote at such election is not found on the register of voters, he shall not receive a ballot until he shall have complied with the law prescribing the manner and conditions of voting by unregistered voters."

While it is true that we have held that the failure to use the register will not, of itself, invalidate the election in any particular precinct, we have never gone to the length of holding that the act of the judges in not only failing to use the register, but in using instead thereof a list of voters prepared by those representing one of the political parties for the use of the challenger of that party, would not constitute fatal irregularity. Experience teaches that such a list contains the name of every person who could possibly be claimed to be a legal voter whose political belief is that of the persons making the list, and excludes those of the opposite party whose right to vote is subject to any doubt whatever or indicates that such persons last mentioned are without right to vote. To use such a list instead of the register places all political parties except the one for whom the list was made at a serious disadvantage. Again, the act of these judges in permitting persons to vote to whom objection

was made, without requiring them to establish their qualifications in the manner prescribed by the law, destroys entirely those safeguards provided by the law to prevent voting by persons not qualified.

These men who acted as judges were mere intruders. They were acting without any right or authority whatever. In the case of *People* v. *Logan County*, 63 Ill. 374, relied upon by appellee, it did not appear, as it does here, that the acting election judges were not properly selected, under the law, to act as judges in the absence of those regularly chosen for that purpose; and that case was decided prior to the passage of the present Election law, providing for printing and distributing official ballots at public expense.

Section 179 of chapter 46, Starr & Curtis' Statutes, provides that the official ballots shall be delivered, not less than twelve hours before the time for opening the polls, to the judges of election. This must mean the judges selected by the board of supervisors, in counties under township organization. When so delivered such judges are certainly without authority to deliver them to any other persons with a view to having such other persons perform the duties of election judges, unless such other persons have been selected in the manner provided by section 37 of chapter 46, Starr & Curtis' Statutes. No such selection was here made.

The irregularities occurring at this polling place were: *First,* the election was not held by the regularly chosen judges or by any persons legally selected to fill the places; *second,* the persons acting as judges did not use the register of electors, but instead used a poll-list prepared for the purposes of one, only, of the political parties participating in the election; *third,* there was no method by which the official ballots could rightfully have come into possession of those who acted as judges; *fourth,* the persons acting as judges permitted persons to vote whose right to vote was questioned, without requir-

ing the affidavits which the law contemplates and without ascertaining that such voters were registered; *fifth*, voters were permitted to prepare their ballots outside the booths, in a portion of the room separated from the polling place by a partition extending partly across the room, and which portion of the room communicated with the outside both by a door and a window.

It seems to us that these irregularities are of a much graver character than that which occurred in Carrier Mills precinct, and if the view of the majority is to control and the vote of a precinct to be entirely rejected for any irregular action on the part of the judges not knowingly and willfully participated in by the voters, then we deem the many derelictions of the judges in Harrisburg district No. 2 sufficient to require the rejection of all the ballots cast therein.

If both Carrier Mills precinct and Harrisburg district No. 2 be excluded, appellant, Choisser, will have a majority of 119, and if neither be excluded his majority will be two, after rejecting 30 votes in the latter precinct, being the lowest estimated number of ballots which were marked outside the booths.

The court below did not reject any of the ballots which were marked in the portion of the room beyond the partition. We agree with the majority that the ballots marked there should, in any event, be rejected, for the reason that the voters who there marked their ballots knew that they were not marking them in the booths provided by law, and therefore willfully and knowingly participated in the wrong.

We therefore do not concur in the conclusion that the judgment of the circuit court should be affirmed.

Mr. JUSTICE RICKS, also dissenting.